710 F.2d 57
 Fed. Sec. L. Rep. P 99,239
MADISON CONSULTANTS, a New York partnership, Robert I.
Blackman and Joseph S. Lefrak, Plaintiffs-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, individually and as
Receiver for Franklin National Bank, Blinder Robinson & Co.,
Inc., Emons Industries, Inc., First National City Bank,
Harold Grossman, Jack Skidell and Certain Persons or
Entities who will participate in the purchase of 115,000
shares of Common Stock of Emons Industries, Inc. from
Federal Deposit Insurance Corporation, Defendants,
Blinder Robinson & Co., Inc., Emons Industries Inc., Harold
Grossman and Jack Skidell, Defendants-Appellees.
 No. 950, Docket 82-7838.
 United States Court of Appeals,
Second Circuit.
 Argued March 14, 1983.
Decided June 13, 1983.
 
 Gerald D. Fischer, New York City (Lefrak, Fischer & Myerson, New York City, of counsel), for plaintiffs-appellants.
 Jeffrey L. Glatzer, New York City (Anthony P. Coles, Slade & Pellman, New York City, of counsel), for defendants-appellees.
 Before MANSFIELD, MESKILL and NEWMAN, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 This case presents us with a novel problem: whether a corporation violates Rule 10b-5 when, through false promises to a minority stockholder that it will not attempt to purchase his stock from a pledgee then holding the stock, it lulls the stockholder into refraining from pursuing various means of protecting his rights in the stock, and then purchases the stock at a price far below its market value.
 
 
 2
 Plaintiffs Robert Blackman and Joseph Lefrak, who owned a minority interest in Emons Industries, Inc. through their partnership, Madison Consultants, appeal from a judgment of the Southern District of New York, Mary Johnson Lowe, Judge, dismissing their complaint under Sec. 10(b) of the Securities Act, 15 U.S.C. Sec. 78j, and Rule 10b-5, 17 C.F.R. Sec. 240.10b-5, against Emons Industries, its then-controlling officer and chief shareholder, Harold Grossman, Grossman's broker, Jack Skidell, and Skidell's brokerage firm, Blinder Robinson & Co., Inc. Because plaintiffs have stated a valid claim for relief under one of their theories of liability, we reverse the judgment of the district court in part, affirm the balance, and remand for further proceedings.
 
 
 3
 Plaintiffs have made the following allegations, the truth of which must be assumed on this appeal. In June 1970 plaintiffs bought stock in Amfre-Grant, Inc., which later changed its name to Emons Industries, Inc. ("Emons"). Because plaintiffs' stock was not registered with the Securities and Exchange Commission ("SEC"), it bore a restrictive legend which prevented its being freely sold in open market transactions; this legend could be removed only on an opinion from Emons' legal counsel. Plaintiffs financed the purchase by borrowing the full price of the stocks, $750,000, from the Franklin National Bank, and pledged the stocks to the Bank as collateral under a security agreement. As of August 1974, the outstanding balance on the loan was $547,129.38. Thereafter, plaintiffs made no further payments on the loan, and went into default in November 1975. During 1975, the Franklin National Bank was declared insolvent, and the Federal Deposit Insurance Corporation ("FDIC") was named as its receiver. In that capacity, the FDIC acquired the Bank's rights under the security agreement with plaintiffs.
 
 
 4
 Plaintiffs' pledged stock would have commanded between $800,000 and $1,000,000 in the market during the first half of 1976 if it could have been sold without the restrictive legend. During the first three months of 1976, both plaintiffs and Emons made offers to purchase the stock from the FDIC; however, no sale then took place. In April 1976 plaintiffs obtained an opinion from their counsel that Emons could properly remove the legend from plaintiffs' stock since the stock was freely saleable under an exception to the registration requirements of the securities laws, see Securities Act of 1933, Sec. 4(1), 15 U.S.C. Sec. 77d(1) ("transactions by any person other than an issuer, underwriter, or dealer"). On April 13, 1976, plaintiffs submitted this opinion to Emons, requesting that Emons remove the legend so that plaintiffs could arrange to have the FDIC sell enough of the shares to pay off the balance of plaintiffs' loan. By letter of April 21, 1976, Emons responded to this request, refusing to remove the legend until the plaintiffs provided Emons with a "no-action letter" from the SEC with respect to the applicable exemption from registration.[1] Plaintiffs assert that a former SEC Commissioner is prepared to testify that Emons' refusal to remove the legend was unjustified under applicable securities laws and regulations.
 
 
 5
 In April 1976 plaintiffs and Grossman allegedly entered into an oral agreement to reconcile their competing efforts to obtain the stock from the FDIC. Complaint paragraphs 55-59. As part of this agreement, Grossman, acting on behalf of Emons, allegedly represented and promised that he would take no steps to purchase or arrange for the purchase of plaintiffs' stock without first consulting with plaintiffs and giving them a chance to participate in the purchase. According to the complaint, these representations were misleading and "constituted an attempt to deceive and defraud Plaintiffs." Complaint p 104. Plaintiffs did not, however, include this allegation of deceit in their contentions of fact in the pretrial order submitted to the district court. However, their complaint alleges that in reliance upon Grossman's fraudulent representations they abandoned their efforts to remove the restrictive legend from the stock or to raise capital to bid for the stock themselves. Complaint p 58.
 
 
 6
 According to plaintiffs, in June 1976 Grossman violated the April agreement by arranging with his broker Jack Skidell and others to purchase plaintiffs' shares from the FDIC without first advising plaintiffs. On or about September 2, 1976, plaintiffs first learned of Emons' plans to purchase their stock when they received a notice from the FDIC advising them that the FDIC intended to sell plaintiffs' shares at one or more private sales. Although the letter from the FDIC did not say so, plaintiffs assumed that Grossman was the intended purchaser of their stock, and this assumption was confirmed over the next few weeks in conversations with the FDIC's counsel and in a letter from Emons' counsel. On September 16, plaintiffs again asked Emons to remove the legend, providing Emons with an updated opinion letter from plaintiffs' counsel stating that the legend could legally be removed. On September 23, Emons responded, again refusing to remove the legends until plaintiffs supplied it with a no-action letter from the SEC. Plaintiffs then applied for a no-action letter, which was issued by the SEC at a date not revealed by the record.
 
 
 7
 Emons then purchased the stock in two stages, acquiring 85,000 shares on or about October 1, 1976, and the remaining 30,000 shares on or about December 2, 1976. The total purchase price was the exact amount due on plaintiffs' loan, $547,129.38. According to the plaintiffs, the pledged stock, which constituted about 9.8% of the total Emons stock outstanding, was then worth over $1,000,000 if it could have been sold without restriction.
 
 
 8
 On September 30, 1976, plaintiffs filed the present action for relief under the Securities Exchange Act of 1934 against the FDIC, Grossman, Emons, Skidell, Blinder Robinson, and First National City Bank. Shortly thereafter, plaintiffs moved for a preliminary injunction to halt further sales of their stock; on October 18, the motion was denied by Judge Griesa, to whom it had been referred for resolution. Later that month, plaintiffs voluntarily dismissed their claim against the First National City Bank, and in February 1979 Judge Lowe dismissed the complaint against the FDIC.
 
 
 9
 After an oral hearing Judge Lowe dismissed the remaining claims by a judgment dated October 25, 1982, finding that plaintiffs had not alleged that any fraud had taken place "in connection with the purchase or sale" of any stock, and that plaintiffs' claims amounted to no more than an allegation of breach of an oral contract. The district court held that under the doctrine of Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), plaintiffs could seek redress only in state court. Plaintiffs appeal only from that part of the judgment that dismissed their claims under Sec. 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against Grossman, Emons, Skidell, and Blinder Robinson.
 
 DISCUSSION
 
 10
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j, forbids "manipulative" or "deceptive" conduct "in connection with the purchase or sale of any security," Santa Fe Industries, supra, 430 U.S. at 473-74, 97 S.Ct. at 1300-1301. Rule 10b-5, promulgated in 1942 under Sec. 10(b), prohibits, inter alia, the making of "any untrue statement of material fact" in connection with the purchase or sale of securities. 17 C.F.R. Sec. 240.10b-5.[2]
 
 
 11
 A threshold issue in this case is whether plaintiffs, being pledgors of stock sold at the direction of FDIC as pledgee, have standing to sue as "sellers" under the Rule's requirement that the defendant's wrongful conduct must be "in connection with the purchase or sale" of securities. See 5 A. Jacobs, Litigation and Practice Under Rule 10b-5, Sec. 38.02[c], at 2-127 to 2-130 (1981). In the classic Rule 10b-5 case, the plaintiff himself decides to buy or sell stock in reliance on the prohibited conduct of the defendants. The present case varies from that setting in two ways. First, the decision to sell the stocks was made not by plaintiffs but by the FDIC. This Circuit has repeatedly held, however, that an owner of securities who is forced to sell them against his will has standing as a "seller" for purposes of Rule 10b-5. See Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 797 (2d Cir.1969) (owner forced to sell by antitrust considerations), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.) (shareholders forced out in short-form merger), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). Second, in the present case plaintiffs were not entitled to the full proceeds of the sale of their stock; their interest was limited to any excess over the amount still owing on their loan to the FDIC, see N.Y.U.C.C. Sec. 9-504(2). Nevertheless, courts have recognized the standing of defaulting pledgors such as plaintiffs here, with only a partial right to the proceeds of the sale of their stock, to sue as "sellers" under Rule 10b-5 when their stock is sold to pay off the loan against which the stock was pledged. See Bosse v. Crowell Collier & MacMillan, 565 F.2d 602, 611 (9th Cir.1977); Dopp v. Franklin National Bank, 374 F.Supp. 904, 907-09 (S.D.N.Y.1974); Cambridge Capital Corp. v. Northwestern National Bank of Minneapolis, 350 F.Supp. 829, 833 (D.Minn.1972) (dictum) (defaulting pledgor has standing). A contrary result would defeat the purpose of Rule 10b-5, which is to be read "not technically and restrictively, but flexibly to effectuate its remedial purposes." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963). A technical construction of standing to sue under Rule 10b-5 would work a serious injustice here, since on the facts pleaded plaintiffs lost several hundred thousand dollars in gain they would have realized from a sale of the stock with restrictive legends removed. Their failure to take steps to realize that gain was allegedly caused by defendants' false assurances. We accordingly hold that plaintiffs have standing to invoke Rule 10b-5. The anti-fraud goals of the Rule should not be frustrated by the presence of "novel or atypical transactions." Crane Co., supra, 419 F.2d at 798.
 
 
 12
 We turn to the merits of plaintiffs' claim that the defendants violated Rule 10b-5. Plaintiffs contend that the defendants violated the Rule in two ways: first, by wrongfully refusing to remove the restrictive legend from the stock in April and September 1976, and second, by falsely assuring plaintiffs that they would not attempt to purchase plaintiffs' stock, thereby lulling plaintiffs into inaction and allowing defendants to buy the stock at a bargain price.
 
 Wrongful Refusal to Remove Legends
 
 13
 Plaintiffs argue that Emons had no right to refuse to remove the restrictive legend on their stock, and that they were injured by the sale of their stock at a price far lower than the stock would have commanded had the legend been removed. These facts may well create a cause of action for plaintiffs under New York law, see Riskin v. National Computer Analysts, Inc., 62 Misc.2d 605, 607, 308 N.Y.S.2d 985, 987 (Sup.Ct. New York County 1970) (corporation may not unreasonably withhold its approval of transfer of a shareholder's restricted stock), modified on other grounds, 37 A.D.2d 952, 326 N.Y.S.2d 419 (1st Dep't 1971); see also Gasarch v. Ormand Industries, Inc., 346 F.Supp. 550, 552 (S.D.N.Y.1972) (discussing New York law). But defendants' allegedly wrongful refusal to remove the legend, without more, does not create a cause of action under Rule 10b-5. Since the Supreme Court's decision in Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1970), an essential ingredient in any 10b-5 case is that the defendants have engaged in some form of manipulation or deception. See Maldonado v. Flynn, 597 F.2d 789, 793 (2d Cir.1979). Plaintiffs have not alleged that defendants engaged in any form of "manipulation," as defined by the Supreme Court, see Santa Fe, 430 U.S. at 476, 97 S.Ct. at 1302, in refusing to remove the legend. Nor do plaintiffs allege that the defendants deceived them in refusing to do so. Plaintiffs knew at all relevant times of defendants' refusal to permit the stock to be freely sold. Since plaintiffs have alleged neither manipulation nor deception, they have no cause of action on this theory under Rule 10b-5. Santa Fe Industries, supra.
 
 
 14
 False Assurances that Defendants would not Attempt to Purchase Plaintiffs' Stock Except in Conjunction with Plaintiffs
 
 
 15
 Plaintiffs also contend that the defendants violated Rule 10b-5 by lying to the plaintiffs about their intentions with respect to plaintiffs' stock.[3] Had plaintiffs known the truth--that defendants were lying to them in April, and were planning to work behind the scenes to buy up plaintiffs' stock--they claim that they would have continued to press to have the legend removed, so that their stock could be sold at a far higher price than defendants were willing to pay.
 
 
 16
 Plaintiffs' complaint in substance alleges that defendants made an "untrue statement of ... fact ... in connection with the ... sale of a[] security." 17 C.F.R. Sec. 240.10b-5(b). In order to make out a Rule 10b-5 damage claim, however, plaintiffs must show that the true information was material in that (1) if they had known the truth about defendants' concealed plans plaintiffs had available some reasonably effective means of protecting themselves against loss, and (2) a reasonable investor in their position would be likely to have considered the facts to be significant in deciding whether to take such self-protective action, see TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Plaintiffs must also show that they were caused to suffer loss as a result of their reliance on defendants' deception, which led them not to avail themselves of the means of self-protection. List v. Fashion Park, Inc., 340 F.2d 457, 462-63 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); 5A A. Jacobs, Litigation and Practice Under Rule 10b-5, supra, Sec. 64.01[a] at 3-279. It therefore becomes necessary to determine whether, upon the complaint and record so far before us, plaintiffs would be precluded from proving these elements.
 
 Existence of Means of Self-Protection
 
 17
 Ordinarily, the question of how a 10b-5 plaintiff might have protected himself if he had known the truth is easily answered: he would not have bought or sold the stock, see, e.g., Gordon v. Burr, 506 F.2d 1080, 1082, 1085 (2d Cir.1974) (plaintiff was falsely told that numerous others would purchase particular company's stock at the same time as plaintiff); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1097 n. 19 (2d Cir.1972) (defendants obtained stocks from plaintiffs without disclosing that they did not intend to pay for them). Defendants here contend that since plaintiffs would have been unable to sell their stock even if they had known the truth, they cannot possibly show that defendants' misrepresentations were material. This argument, however, overlooks a line of precedent beginning with footnote 14 of the Supreme Court's opinion in Santa Fe, supra, 430 U.S. at 474, 97 S.Ct. at 1301.
 
 
 18
 In Santa Fe, minority shareholders in a subsidiary corporation brought suit under Rule 10b-5 against the majority shareholder of the subsidiary in the wake of a short-form merger of the subsidiary and its parent. The plaintiffs based their claim primarily on the unfairness of the price paid for their shares. The Supreme Court responded to this claim by holding that mere allegations of unfairness, in the absence of charges of deceptive or manipulative conduct, are not cognizable under Sec. 10(b) or Rule 10b-5. Plaintiffs also alleged, in a different count, that the majority stockholders had violated the Rule by failing to give the minority advance notice of the merger. The Supreme Court ruled on this argument as follows:
 
 
 19
 "[R]espondents do not indicate how they might have acted differently had they had prior notice of the merger.... [T]hey could not have enjoined the merger because an appraisal proceeding is their sole remedy in the Delaware courts for any alleged unfairness in the terms of the merger. Thus, the failure to give advance notice was not a material non-disclosure within the meaning of the statute or the Rule." Santa Fe, 430 U.S. at 474 n. 14, 97 S.Ct. at 1301 n. 14.
 
 
 20
 The Courts of Appeals have unanimously read this language to mean that plaintiffs may prove the existence of a means of self-protection by showing that they could have pursued some available state remedy if they had not been deceived. See Goldberg v. Meridor, 567 F.2d 209, 218-20 (2d Cir.1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); see also IIT v. Cornfeld, 619 F.2d 909, 922-23 (2d Cir.1980); Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 645-47 (3d Cir.1980); Alabama Farm Bureau Mutual Casualty Co., Inc. v. American Fidelity Life Insurance Co., 606 F.2d 602, 613-14 (5th Cir.1979), cert. denied, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980); Kidwell ex rel. Penfold v. Meikle, 597 F.2d 1273, 1291-94 (9th Cir.1979); Wright v. Heizer Corp., 560 F.2d 236, 249-51 (7th Cir.1977), cert. denied, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978); but see R. Jennings & H. Marsh, Securities Regulation 951-52 (1982).
 
 
 21
 Had plaintiffs here known the truth about defendants' intentions in April, when Grossman allegedly lied to them, several options would have been available to them to attempt to prevent the bargain sale of their securities for approximately half of the price they would yield if sold unrestricted in a free market. First, they might have immediately sought a state court injunction directing the defendants to remove the legend, on the theory that defendants had unreasonably refused to do so, see Riskin v. National Computer Analysts, Inc., 62 Misc.2d 605, 607, 308 N.Y.S.2d 985, 987 (Sup.Ct. New York County 1970), modified, 37 A.D.2d 952, 326 N.Y.S.2d 419 (1st Dep't 1971). Second, they might have sought an SEC no-action letter immediately in April rather than waiting until September. Had the SEC supplied a no-action letter at that time, the plaintiffs could have renewed their request to Emons to remove the legend and, if it refused to do so, obtained a court order directing it to do so. See Riskin, supra, 37 A.D.2d at 952, 326 N.Y.S.2d at 420. If these actions had succeeded in persuading or forcing Emons to remove the legend, plaintiffs could have arranged to have the FDIC sell their stock on the open market and return to them any proceeds over the approximately $547,000 due on their loan, or, in the alternative, sell enough of the stock to pay off their debt, and turn over the remaining shares to them.
 
 
 22
 The availability of means of self-protection aside from state court relief has been recognized as satisfying the strictures of Santa Fe. See, e.g., United States v. Margala, 662 F.2d 622, 626-27 (9th Cir.1981) (stockholders "frozen out" by manipulative scheme could have sold out earlier or publicly exposed the scheme, if they had been aware of the truth); Wright v. Heizer, supra, 560 F.2d at 250 (stockholders could have exercised power under state law to veto transaction). We are satisfied that upon a fair reading of Santa Fe, as it has been interpreted in Goldberg v. Meridor and other decisions cited supra, the existence of the various alternative forms of protection available to plaintiffs here (e.g., state court injunctive relief, SEC no-action letter, exposure of defendants to the SEC) would satisfy the threshold test for materiality under Rule 10b-5.[4]
 
 
 23
 Likelihood of Significance to the Reasonable Investor
 
 
 24
 Since plaintiffs, if they had known the truth, could have taken steps to protect their interest in the several hundred thousand dollars of appreciation of their stock, it is obvious that they should be permitted to prove that the truth was material in the sense that a reasonable investor would likely have considered the information significant in deciding whether to take action to protect himself. TSC Industries, Inc. v. Northway, Inc., supra, 426 U.S. at 449, 96 S.Ct. at 2132.
 
 Causation
 
 25
 In order to establish that defendants' alleged misrepresentation caused them loss, plaintiffs must show by a preponderance of the evidence that they believed the misrepresentation, that they relied on it in not pursuing available methods of self-protection, and that they would have succeeded if they had been advised of the truth and had pursued such remedies. See Wilson v. Comtech Telecommunications Corp., 648 F.2d 88, 92 n. 6 (2d Cir.1981). The degree of success which plaintiffs must establish has not yet been explicitly addressed by this Circuit.[5] Other circuits have adopted varying views. See Kidwell ex rel. Penfold v. Meikle, 597 F.2d 1273, 1294 (9th Cir.1979) (plaintiff must show he would actually have succeeded in his efforts); Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 647 (3d Cir.1980) (plaintiff must show he would have had a reasonable probability of success); Alabama Farm Bureau Mutual Casualty Insurance Co. v. American Fidelity Life Insurance Co., 606 F.2d 602, 614 (5th Cir.1979), cert. denied, 446 U.S. 933, 100 S.Ct. 2149, 64 L.Ed.2d 785 (1980) (plaintiff need only show that he would have made out a prima facie case for relief); see also Note, Causation in Rule 10b-5 Actions for Corporate Mismanagement, 48 U.Chi.L.Rev. 936, 956-59 (1981) (endorsing standard of Alabama Farm Bureau ). In addition, one commentator has argued that the correct standard is whether the plaintiff would have stated a cause of action for relief in state court. See Note, Suits for Breach of Fiduciary Duty Under Rule 10b-5 After Santa Fe Industries, Inc. v. Green, 91 Harv.L.Rev. 1874, 1894-98 (1978).
 
 
 26
 In our view the "cause of action" test and the "prima facie case" test are too weak to satisfy Rule 10b-5's requirement that the plaintiff's injury be caused in fact by the defendant's conduct. See List v. Fashion Park, Inc., supra, 340 F.2d at 463. A test that looks only to the statement of a claim for relief would mandate a finding of causation even in cases in which the plaintiff would almost certainly have lost at a later stage in the case, such as on a summary judgment motion based on undisputed facts. A test that looks to the existence of a prima facie case, besides employing a notoriously ambiguous piece of legal terminology, see 9 J. Wigmore, Evidence Sec. 2494, at 378-81 (Chadbourn ed. 1981), would require a finding of causation even when the defendant could devastatingly rebut the plaintiff's case. The adoption of such standards would come too close to the creation of a presumption of causation.[6]
 
 
 27
 We believe that the correct view is that the plaintiff must show that he would have succeeded in preventing the loss he in fact suffered. See Kidwell ex rel. Penfold v. Meikle, supra. This standard does not obligate a plaintiff to prove beyond a reasonable doubt or to an absolute certainty that he would have won the state court suit or otherwise prevented the injury that he in fact suffered. He needs to prove only by a fair preponderance of the evidence that he would have succeeded. This is the standard generally applied to a claim that defendant's wrong prevented the plaintiff from pursuing a judicial remedy. See, e.g., Urtz v. New York Cent. & H.R.R. Co., 202 N.Y. 170, 179, 95 N.E. 711 (1911); DeVito v. New York Central System, 22 A.D.2d 600, 603, 257 N.Y.S.2d 895, 899 (1st Dept.1965). If this test may sometimes lead to a "trial within a trial," see Healey v. Catalyst Recovery of Pennsylvania, Inc., supra, 616 F.2d at 647; Alabama Farm Bureau Mutual Casualty Insurance Co. v. American Fidelity Life Insurance Co., supra, 606 F.2d at 614, this results not from any excessiveness in the burden but from the nature of the claim, which depends upon an appraisal of the chances of success in a state court suit. Indeed, if the plaintiff's burden in the state court action were lower, such as when preliminary injunction relief would have been tantamount to success, that factor would be taken into account in the federal suit under the standard we require.
 
 
 28
 Defendants' final contention may be disposed of briefly. Defendants argue that plaintiffs are attempting to convert a state law action for breach of contract into a federal fraud suit, contrary to the federalism concerns expressed by the Supreme Court in Santa Fe, see 430 U.S. at 477-80, 97 S.Ct. at 1302-1304. The Santa Fe Court did state that one factor to be taken into account in determining whether plaintiffs have a cause of action under Rule 10b-5 is whether "the cause of action [is] one traditionally relegated to state law...." Santa Fe, 430 U.S. at 478, 97 S.Ct. at 1303, quoting Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 40, 97 S.Ct. 926, 948, 51 L.Ed.2d 124. This is not to say, as the Court explicitly noted, that Rule 10b-5 provides relief only when state remedies are unavailable. Santa Fe, 430 U.S. at 478, 97 S.Ct. at 1303. Indeed, such a doctrine would eviscerate the Rule, since state common law remedies at least theoretically "permit redress in most (if not all) 10b-5 areas." 5 A. Jacobs, supra, Sec. 11.01 at 1-278. Rather, the Santa Fe Court simply held that violations of state law may be redressed under the Rule only if they involve deception or manipulation in connection with the purchase or sale of securities. See 430 U.S. at 477-80, 97 S.Ct. at 1302-1304.
 
 
 29
 Thus, in the present case plaintiffs may have an action for breach of contract under New York law, although it might be barred by the statute of frauds. Plaintiffs are not limited to a state breach of contract action, however, because they allege that defendants entered the oral contract in April 1976 by making promises that they never intended to keep. Such an allegation--that the defendant's contractual promises were fraudulent from the inception--clearly distinguishes the present case from an ordinary breach of contract action. See Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir.1971); A.T. Brod & Co. v. Perlow, 375 F.2d 393, 395, 398 (2d Cir.1967).
 
 
 30
 The judgment of the district court is affirmed as to the claim based on wrongful refusal to remove the restrictive legends. We reverse that portion of the judgment that dismissed plaintiffs' claim based on defendant's allegedly false assurances to plaintiffs, and remand the case for further proceedings consistent with this opinion.
 
 MESKILL, Circuit Judge, dissenting:
 
 31
 I respectfully dissent. The complaint here states at most a state law breach of contract claim. The majority distills a rule 10b-5 cause of action from a complaint and pretrial order devoid of any specific allegations of fraud or deceit. We should not attempt to remedy defects in plaintiffs' pleadings to convert a commonplace state law claim into a cause of action under the federal securities laws.
 
 
 32
 Under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j (1976), and rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1982), plaintiffs must allege that defendants have engaged in "manipulative" or "deceptive" conduct in connection with the sale of any security "which operates or would operate as a fraud or deceit." Santa Fe Industries v. Green, 430 U.S. 462, 471-74, 97 S.Ct. 1292, 1299-1301, 51 L.Ed.2d 480 (1977); Maldonado v. Flynn, 597 F.2d 789, 793 (2d Cir.1979). This Circuit has articulated stringent pleading standards for rule 10b-5 claims and has required particularized allegations of fraud. See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 114 (2d Cir.1982) ("conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough"); Ross v. A.H. Robins Co., 607 F.2d 545, 557-58 (2d Cir.1979), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); Segal v. Gordon, 467 F.2d 602, 606-08 (2d Cir.1972); Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir.1971).
 
 
 33
 Here the majority construes the complaint as alleging that defendants violated rule 10b-5 by falsely assuring plaintiffs that they would not attempt to purchase the FDIC-held stock, "thereby lulling plaintiffs into inaction and allowing defendants to buy the stock at a bargain price."[1] The complaint actually alleges only that (1) defendants orally agreed to provide plaintiffs with a veto power over the purchase of the stock, paragraphs 55, 56, J.App. at 14, and (2) plaintiffs relied on this agreement in ceasing their own efforts to acquire the stock, p 58, J.App. at 15. No facts are alleged which link defendants' execution and subsequent breach of this oral agreement with any fraudulent intent to deceive plaintiffs.
 
 
 34
 Although the boilerplate language in the complaint states that "[e]ach defendant knew or should have known that such representations and actions were misleading and constituted an attempt to deceive and defraud Plaintiffs," p 104, J.App. at 22 (emphasis added), there is no allegation that defendants falsely promised to perform the oral agreement. Without a specific averment of fraudulent intent, section 10(b) provides no remedy. See Decker v. Massey-Ferguson, Ltd., 681 F.2d at 114; cf. Lewart v. Woodhull Care Center Associates, 549 F.Supp. 879, 883 (S.D.N.Y.1982) ("It is clear, however, that [common law] fraud requires more than a showing of non-performance of the promise; an intent not to perform must be established independent from the showing of failure to perform."); Cranston Print Works Co. v. Brockmann International A.G., 521 F.Supp. 609, 614 (S.D.N.Y.1981) ("This claim manifestly sounds in contract. Cranston's attempt to convert this to a tort claim for fraud is based upon the additional naked assertion that BIAG ... never intended to perform as promised ....").
 
 
 35
 Perhaps as damaging as the complaint's defects is the fact that the pretrial order made no mention of defendants' fraudulent or false promise. The Federal Rules of Civil Procedure provide that "such [pretrial] order when entered controls the subsequent course of the action." Fed.R.Civ.P. 16 (emphasis added). It is well-established law that " '[t]he pre-trial order supersedes the pleadings and becomes the governing pattern of the lawsuit.' " Rompe v. Yablon, 277 F.Supp. 662, 663 (S.D.N.Y.1967) (quoting Case v. Abrams, 352 F.2d 193, 195 (10th Cir.1965)); see Napolitano v. Compania Sud Americana De Vapores, 421 F.2d 382, 386 (2d Cir.1970); Laguna v. American Export Isbrandtsen Lines, Inc., 439 F.2d 97, 104 (2d Cir.1971) (Lumbard, J., dissenting). If a claim or issue is omitted from the order, it is waived. See Flannery v. Carroll, 676 F.2d 126, 130 (5th Cir.1982); Price v. Inland Oil Co., 646 F.2d 90, 95 (3d Cir.1981); Union Planters National Bank v. Commercial Credit Business Loans, Inc., 651 F.2d 1174, 1188 (6th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). Nowhere in the entire twelve pages of the pretrial order is there any allegation that defendants made the oral agreement with the intention of deceiving, defrauding or manipulating plaintiffs. Consequently, plaintiffs' omission of this allegation from the pretrial order spells the death knell for their rule 10b-5 cause of action.
 
 
 36
 The majority's remedy for this void is to suggest that on remand plaintiffs amend the pretrial order. Under Rule 16 a pretrial order may be amended "to prevent manifest injustice." See Laguna v. American Export Isbrandtsen Lines, Inc., 439 F.2d at 101. Yet, the facts of this case do not justify such a cavalier dismissal of the restraint embodied in Rule 16. Plaintiffs have had approximately six years between the commencement of their suit in September 1976 and the filing of the pretrial order in April 1981 to engage in discovery and refine their understanding of the facts. After all this time they still fail to allege the crucial fact that when defendants entered into the 1976 oral agreement, they had no intention of honoring it. Rather than attributing this omission to mere oversight, I think it is more likely that after years of searching for the missing link, plaintiffs have simply failed to find evidence to support their claim of fraud.
 
 
 37
 Regardless of one's views concerning the relative flexibility of Rule 16, I do not believe that it is our role to fill the interstices in plaintiffs' pleadings or argument.
 
 
 38
 Ours is an adversary system of justice.... In our system lawyers worry about the whereabouts of witnesses. The court does not. Lawyers worry about proof. The court does not .... Lawyers get the case ready for trial. The court does not.
 
 
 39
 McCargo v. Hedrick, 545 F.2d 393, 401 (4th Cir.1976) (emphasis added). Although Rule 16's "manifest injustice" language provides an exception to the otherwise binding nature of pretrial orders, it was never intended as a justification for courts to modify pretrial orders based on legal theories never presented by the parties.[2] At-will modification of pretrial orders is judicial activism run rampant.
 
 
 40
 Furthermore, the colloquy between our panel and plaintiffs' counsel at oral argument emphasized both plaintiffs' failure to state a rule 10b-5 cause of action and the majority's efforts to craft a legal theory which would remedy that failure. In framing the issue on appeal, plaintiffs queried "whether ... the acts of the defendants in refusing to remove a restrictive legend on shares owned by the plaintiff, 150,000 shares of Emons Industries, constituted a fraud in connection with the purchase [of that stock] by Emons Industries ...." Plaintiffs' remarks completely ignored the alleged false promise as a basis for the rule 10b-5 claim. Even after incessant questioning by a member of the panel, plaintiffs refused to state affirmatively that the fraud underlying their rule 10b-5 claim stemmed from defendants' promising to cooperate in the purchase of stock without ever intending to live up to that agreement.
 
 
 41
 Although the Federal Rules of Civil Procedure generally embody a liberal policy of notice pleading, the drafters expressly required more specificity in pleading claims of fraud. See Fed.R.Civ.P. 9(b). In the common law fraud context, a number of courts have expressly rejected plaintiffs' efforts to convert breach of contract actions into tort claims of fraud. See Lewart v. Woodhull Care Center Associates, 549 F.Supp. at 883; Cranston Print Works Co. v. Brockmann International A.G., 521 F.Supp. at 614 ("Several courts have rejected such efforts to convert a contract action into a tort claim of fraud based upon just such an allegation that a contracting party never intended to fulfill his promise.").
 
 
 42
 Such stringent pleading requirements are even more compelling with respect to rule 10b-5 claims. If amorphous allegations sufficed to state a cause of action for securities fraud, the floodgates would open to scores of state law claimants who seek access to federal court. The Supreme Court recently admonished the federal courts that "[a]bsent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities." Santa Fe Industries v. Green, 430 U.S. at 479, 97 S.Ct. at 1304; see Decker v. Massey-Ferguson, Ltd., 534 F.Supp. 873, 879 & n. 9 (S.D.N.Y.1981), modified, 681 F.2d 111, 120-21 (2d Cir.1982); Golar v. Daniels & Bell, Inc., 533 F.Supp. 1021, 1027 (S.D.N.Y.1982). The majority's decision transmogrifies a commonplace state law breach of contract claim into a federal securities law violation and in so doing pays only lip-service to the Supreme Court's concerns in Santa Fe Industries v. Green, 430 U.S. at 479, 97 S.Ct. at 1304. I would affirm the district court's dismissal of the complaint for failure to state a cause of action under section 10(b) and rule 10b-5.
 
 
 
 [1]
 A person seeking a specific interpretation of the securities laws can submit to the SEC a statement of relevant facts along with an opinion from an attorney as to why a particular action does not violate the securities laws. If the SEC staff agrees that the facts described do not constitute a violation of the securities laws, it will issue a letter stating that it "will not recommend that the Commission take any action" if the proposed transaction is undertaken--a so-called "no-action" letter
 While issuance of such a letter does not estop the SEC from taking future enforcement action, the Commission has rarely taken action against an individual after its issuance of a no-action letter. See 3 H. Bloomenthal, Securities and Federal Corporate Law Sec. 1.11, at 1-50.3 (1980).
 
 
 [2]
 Rule 10b-5 provides:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 "(a) To employ any device, scheme, or artifice to defraud,
 "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."
 
 
 [3]
 As noted above, plaintiffs omitted from their portion of the pretrial order the allegation found in their complaint that defendants entered into the April 1976 agreement not intending to honor it. However, a pretrial order may be modified to prevent "manifest injustice." Fed.R.Civ.P. 16. This Circuit has held that permission to amend a pretrial order is to be granted when "the interests of justice make such a course desirable." Clark v. Pennsylvania R.R. Co., 328 F.2d 591, 594 (2d Cir.), cert. denied, 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964); see Laguna v. American Export Isbrandtsen Lines, Inc., 439 F.2d 97, 101-02 (2d Cir.1971) ("we have not viewed ... modification [of pretrial orders] with hostility."); Cruz v. United States Lines Co., 386 F.2d 803, 804 (2d Cir.1967); Scott v. Spanjer Bros., Inc., 298 F.2d 928, 931 (2d Cir.1962); see also Jeffries v. United States, 477 F.2d 52, 55 (9th Cir.1973); Sherman v. United States, 462 F.2d 577, 579 (5th Cir.1972); Washington Hospital Center v. Cheeks, 394 F.2d 964, 965-66 (D.C.Cir.1968)
 Defendants here would not be seriously prejudiced if plaintiffs were permitted to amend the pretrial order to include an allegation that defendants' promises were fraudulent when made. Nearly all of the pretrial proceedings were conducted on the basis of the complaint, which, though not a model of draftsmanship, did put defendants on notice of plaintiffs' essential claims. Moreover, in the present case the pretrial order would be amended neither in the midst of trial, see Price v. Inland Oil Co., 646 F.2d 90, 95-96 (3d Cir.1981), nor on the eve of trial, see Laguna v. American Export Isbrandtsen Lines, Inc., supra, 439 F.2d at 103, 104 (Lumbard, C.J., dissenting), thus substantially lessening the likelihood that defendants would suffer any prejudice as a result of the modification.
 We note also that at the hearing below plaintiffs stated their fraud claim forthrightly: "What we are saying is they lied to us to get us to withdraw our request, and they lied to us and then went to the bank and bought our stock." A. 121a. We conclude that the interests of justice dictate that plaintiffs be permitted to amend the pretrial order to include the complaint's allegation that defendants' representations were fraudulent when made.
 
 
 [4]
 Plaintiffs also allege that they relied by not seeking to raise funds to purchase the shares themselves from the FDIC. Upon remand they should be permitted to offer evidence in support of this claim
 
 
 [5]
 At least one commentator has read this Court's opinion in Goldberg v. Meridor, supra, 567 F.2d 209, to endorse the "cause of action" test. See Note, Suits for Breach of Fiduciary Duty Under Rule 10b-5 After Santa Fe Industries, Inc. v. Green, 91 Harv.L.Rev. 1874, 1897 (1978). However, the Goldberg court never explicitly addressed the issue of the proper standard concerning proof of success of foregone protective measures. Implicitly, Goldberg applied the standard that we set out below: that the plaintiff prove that he would have succeeded in preventing his loss. Goldberg was a derivative action in which the plaintiffs alleged that the defendants had caused the corporation in which plaintiffs held stock to enter into a transaction that the court noted would "ensure [the corporation's] doom," and that amounted to "looting" by the defendants. 567 F.2d at 214, 221. In addition, the Goldberg court noted that the state courts from which plaintiffs there might have sought relief had "displayed no hesitancy in granting injunctive relief" under circumstances similar to those presented in Goldberg. Id. at 219. Thus, the Goldberg court clearly believed that the plaintiffs there would have been able to obtain injunctive relief, and it based its opinion on that assumption
 
 
 [6]
 In some circumstances we will presume that plaintiffs relied on the defendant's deception. See Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (presumption of reliance when case concerns "primarily a failure to disclose"). This presumption of reliance sometimes amounts to a presumption of causation. To prove causation, a 10b-5 plaintiff must show not only that he relied by not pursuing some available method of protecting himself, but also that his protective efforts would have succeeded. See discussion supra. In the classic 10b-5 case, in which the plaintiff himself directly buys or sells securities in reliance upon the defendant's deceptive actions, the latter element is easily proved: the plaintiff certainly would have succeeded in protecting himself, because he directly controls his means of protection--declining to enter into the injurious transaction. In such a case--for example, Affiliated Ute itself--a presumption of reliance amounts to a presumption of causation
 In a case such as Goldberg or the present lawsuit, the plaintiff is not master of his own means of self-protection; he must enlist the aid of courts, the SEC, or others to attempt to prevent injury to himself, and he may or may not succeed. Thus, even if the plaintiff in such a case relied by not pursuing some indirect means of self-protection, that reliance may not be the cause of his injury if the means of self-protection would have failed. See Note, supra, 48 U.Chi.L.Rev. at 948; but cf. Note, supra, 91 Harv.L.Rev. at 1894-95.
 
 
 [1]
 Plaintiffs also alleged that defendants' wrongful refusal to remove the restrictive legend from the stock provided the element of "deceit" needed to state a 10b-5 claim. The majority persuasively rejected this claim
 
 
 [2]
 The parties have represented to the court that the New York Statute of Frauds, N.Y.Est. Powers & Trusts Law Sec. 13-2.1 (McKinney 1967), will bar plaintiffs' breach of contract action in state court. However, the existence of a valid defense to a state court cause of action does not satisfy the "manifest injustice" exception to Rule 16. That there may be a valid defense to a state court cause of action does not justify opening the doors of the federal courthouse to the litigation of state law claims