**Elfriede MAYER, Plaintiff,**

v.

**OIL FIELD SYSTEMS CORP., Integrated Energy, Inc., Burton Joel Ahrens and "John Doe", fictitious, the true name or names of such defendants being presently unknown to the plaintiff, Defendants.**

**No. 82 Civ. 3757 (RWS).**

United States District Court, S.D. New York.

June 11, 1985.

**636**

Stull, Stull & Brody, New York City, for plaintiff; Richard J. Stull, Jules Brody, New York City, of counsel.

Christy & Viener, New York City, for defendants Oil Field Systems Corp. and Burton Joel Ahrens; Franklin B. Velie, Janis G. White, New York City, of counsel.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for defendant Integrated Energy, Inc., Brian J. Gallagher, Richard Wynne, New York City, of counsel.

SWEET, District Judge.

Defendants Oil Field Systems Corp. ("OFS") and Integrated Energy Inc. ("Integrated") have moved for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff Elfriede Mayer ("Mayer") has cross-moved for summary judgment on the issue of liability against ("OFS") and has also moved pursuant to Fed.R.Civ.P. 23 for certification of this action as a class action. The motion by defendants OFS and Integrated is granted, and the case is dismissed.

**Prior Proceedings**

In an opinion of January 13, 1983, I granted OFS's and Integrated's motion to dismiss, holding that Mayer lacked standing to bring this securities and common law fraud action. The Second Circuit reversed and remanded, 721 F.2d 59 (2nd Cir.1983), holding that Mayer, under the theory enunciated in *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) had the requisite standing. The parties have had substantial discovery, and these crossing motions for summary judgment have resulted.

**The Complaint**

Mayer's amended complaint alleges that OFS, as general partner of the Mark Energy Partnerships ("MEP"), misallocated Integrated stock received by the Mark Energy Partnerships as a result of an exchange offer. OFS allegedly distributed the stock of MEP among the general and limited partners and breached the partnership agreement by valuing the Integrated stock at the arbitrary $10 exchange rate rather than the substantially lower market price, thereby establishing a fictional "payout" of the limited partners and permitting the general partners of OFS to share improperly in the Integrated stock. The amended complaint also alleges that Integrated failed to disclose OFS' improper intentions and conspired with OFS to defraud Mayer through the concealed misallocation of the Integrated stock.

Specifically, Mayer claims that:

1) OFS and Integrated failed to disclose that they valued the Integrated stock at $10/share knowing that the stock did not have this value;

2) OFS and Integrated failed to disclose that they valued Integrated stock at $10/share to permit an accelerated payout and the consequent misallocation of shares to the general partners;

3) OFS and Integrated failed to disclose that the $10 per share price, and not the market value, was used to compute when payout had been reached;

4) OFS made a materially false and misleading statement in correspondence to the limited partners when it said that Bache Halsey Stuart Shields ("Bache") was underwriting the Exchange Offer; and

5) OFS made a false and misleading statement in correspondence to the limited partners when it stated that the shares' market value might drop initially but would then "zestily rebound."

Mayer alleges that OFS's and Integrated's deceptions constitute violations of 15 U.S.C. § 78j(b); 15 U.S.C. §§ 77k and 1, and OFS's and Integrated's common law fiduciary obligations.

**Facts**

Facts sufficient to resolve the motions for summary judgment are undisputed. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir.1980).

Mayer is a citizen and resident of New York. OFS is a New York corporation which owns interests in oil and gas properties and has been a general partner in a number of oil partnerships. Mayer was a limited partner in two MEP partnerships— the Mark Energy 1979 partnership and Mark Energy 1980 partnership—of which OFS was the general partner. Integrated is a Delaware corporation formed in 1979 to acquire oil and gas properties.

The limited partnership agreements of both of the Mark Energy Partnerships state that the general partner has complete and exclusive authority to manage and control the partnerships. Section 12.1(a) of the Mark Energy 1979 Partnership limited partnership agreement provides in pertinent part:

Subject to the limitations set forth in this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the affairs of the Partnership for the purposes herein contemplated, and shall make all decisions affecting Partnership affairs.

Section 11.1 provides in pertinent part:

No Limited Partner shall take part in the management of the Partnership's business or affairs or transact any business for the Partnership ...

*See also* Sections 11.1(a) and 10.1 of the Mark Energy 1980 Partnership limited partnership agreement.

Mayer testified at her deposition that she is sure she read the limited partnership agreements for each of the Mark Energy Partnerships before investing in them and understood that the limited partners had no control over management.

The limited partnership agreements describe the procedure for compensation of the general partners. Section 5.2(a)(ii) of the Mark Energy 1979 Partnership limited partnership agreement provides in pertinent part:

the General Partner shall receive a 1% Partnership interest, increasing to a 25% Partnership interest after Payout, in all items of Partnership income, losses, deductions and credits.

"Payout" is defined in section 2.1(n):

The time at which Partnership Net Revenues distributed or distributable to the Limited Partners equals the aggregate amount contributed by the Limited Partners to the capital of the Partnership under their Subscription Agreements.

Similarly, Section 5.1(c) of the Mark Energy 1980 Limited Partnership agreement provides:

The General Partner shall cause the Partnership to assign, after First Payout, the following Working Interests in Partnership Leases: General Partner—4%; Mark Energy Corporation ("Mark Energy") [the partnership's financial consultant and structuring agent]—10%; participating sales agents and offeree representatives—5% in the aggregate.

"First Payout" is defined in section 2.1(g):

The time at which Partnership Net Revenues distributed or distributable to the Limited Partners equals the aggregate amount contributed by the Limited Partners to the capital of the Partnership under their Subscription Agreements.

On March 24, 1981, Integrated distributed a prospectus (the "Prospectus") in which it offered to exchange shares of its common stock for certain interests in oil and gas properties (the "Exchange Offer").

As disclosed in the Prospectus, Bache agreed to act as Dealer Manager for the Exchange Offer. The Prospectus disclosed the procedure by which Integrated proposed to determine the number of shares to be distributed for each interest tendered as follows:

The number of shares of Common Stock issuable for tendered interests will be determined by dividing the exchange values (the "Exchange Values") of such interests by $10, an arbitrary figure which has been established for the purpose of making the Exchange Offer. The Exchange Values of Interests tendered will be determined based upon available engineering estimates and other information.

Risks involved in the Exchange Offer were disclosed as follows:

No market for the Company's Common Stock currently exists. However, the Company expects that a market will develop and intends to apply for listing of the Common Stock on the American Stock Exchange after consummation of the Exchange Offer. No assurance can be given that the Common Stock will be listed, since the ability of the Company to meet the Exchange's financial requirements cannot be determined until completion of the Exchange Offer. The prices at which the Common Stock may trade following the consummation of the Exchange Offer may be more or less than the $10 used to determine the number of shares issuable for Interests, and may bear no relationship to the Exchange Values or the fair market values of the tendered Interests.

Prospectus at 2.

On or about May 7, 1981, OFS sent a copy of the Integrated Prospectus with copies of articles from Fortune Magazine, The New York Times, and Legal Times of Washington to each of the limited partners of the Mark Energy Partnerships, including Mayer. The cover letters to the limited partners stated:

*We have not determined whether to accept the Integrated proposal or not, but feel we should proceed with the Sipes' evaluation of your wells. Once the reservoir report is completed, we will make a decision based on the results.*

. . . . .

In the event we accept the exchange, it is our intention to distribute the shares to the partners.

. . . . .

The market risk should be somewhat ameliorated by the fact that Bache is simultaneously underwriting Integrated's shares at $10 per share and would have strong incentive to protect the market. The conventional wisdom as set forth in the Fortune article is that the stocks initially go down while people who exchanged liquidate their interest, and then zestily rebound.

(emphasis in original).

Mayer testified that she received and read the Prospectus.

During the spring and summer of 1981, Integrated and OFS entered into negotiations to include some of the properties managed by OFS in the Exchange Offer, including the interests of the MEP Partnerships. OFS obtained an independent appraisal of the properties operated by each of the Mark Energy Partnerships from Sipes, Williamson & Associates ("Sipes").

Integrated accepted the appraisal values of the Mark Energy Partnerships determined by Sipes, although MEP is alleged by Mayer to have protested that Sipes' appraisals were too low, and provided a final Prospectus and Letters of Acceptance to OFS. Pursuant to the terms of the Prospectus, and according to the Sipes' appraisals, the exchange value for the Mark Energy 1979 Partnership was set at $4,073,050 and the exchange value for the Mark Energy 1980 Partnership was set at $2,132,800. Prospectus Supplement at 23.

Based on the dollar value of the properties of the Mark Energy Partnerships, as determined by the Sipes appraisals and accepted by Integrated for the purposes of the exchange and the distribution of stock at $10/share, OFS determined that partnership net revenues distributable to the limited partners equaled the amounts contributed by the limited partners to the capital of the partnerships under their subscription agreements and that payout had been reached.

On August 3, 1981, OFS executed the Letters of Acceptance, indicating its intent to have the Mark Energy Partnerships participate in the Exchange Offer. Integrated issued a Prospectus Supplement on September 11, 1981, which set forth the results of the Exchange Offer and certain information regarding the oil and gas property and partnership interests tendered.

The Prospectus Supplement disclosed that Bache was acting as Dealer Manager for the Exchange Offer and that the figure of $10 per share for the common stock of Integrated was an arbitrary figure:

> The number of shares of Common Stock issuable for the Interests has been determined by dividing the Exchange Values of such Interests by $10.00, an arbitrary figure which has been established for the purpose of making the Exchange Offer.

The Prospectus Supplement further disclosed the risks involved in the Exchange Offer as follows:

> The prices at which the Common Stock may trade following the consummation of the Exchange Offer may be significantly less than the $10 used to determine the number of shares issuable for Interests, and may bear no relationship to the Exchange Values or the fair market values of the tendered Interests.

OFS sent a copy of the Prospectus Supplement to each of the limited partners of the Mark Energy Partnerships, including Mayer, on or about September 15, 1981. The cover letter to the limited partners of the Mark Energy 1979 Partnership stated that:

> [Y]our Program will receive $4,073,050 in exchange value of Integrated stock (valued at $10 per share) less all income received from the wells since February 28, 1981.

> . . . . .

> Pursuant to the Partnership Agreement the Limited Partners as a group are entitled to 99% of the Integrated shares until the Program reaches Payout and 75% of the remaining Integrated shares after the Program reaches Payout.

The cover letter to the limited partners of the Mark Energy 1980 partnership explained that:

> [Y]our Program will receive $2,132,800 in exchange value of Integrated stock (valued at $10 per share) less all income received from the wells since February 28, 1981.

> . . . . .

> Pursuant to the Partnership Agreement the Limited Partners as a group are entitled to 99% of the Integrated shares until the Program reaches First Payout (100% of contributed capital), 80% after First Payout, and 70% after Second Payout (120% of contributed capital).

Mayer testified that she received and read the Prospectus Supplement.

On or about October 6, 1981, OFS sent a letter to each of the limited partners of MEP, including Mayer. OFS informed the limited partners that the Exchange Offer had a projected closing date of October 15, 1981 and that the shares of Integrated common stock would be sent directly to the limited partners. In addition, each letter contained a space in which the number of shares to be received by that limited partner was inserted. The letter also explained:

> For the purpose of both determining the number of shares to be issued by Integrated as well as determining when pay-out is reached the $10.00 exchange price has been applied.

On October 12, 1981, Mayer's son, acting as her investment adviser, called OFS from Mayer's home to discuss the Integrated Exchange Offer. Mayer testified that her son was told that the $10 per share price of the Integrated common stock was chosen arbitrarily, that the stock could trade at a higher or lower price, and that the $10 figure was used to determine when the Mark Energy Partnerships reached payout.

Neither the Prospectus nor the Prospectus Supplement, which were issued by Integrated to the owners of all oil and gas properties participating in the Exchange, explained the basis for determining when payout was reached in the MEP partnerships.

Following receipt of the October 6, 1981 letter and the October 12, 1981 telephone conversation, Mayer felt that payout should be determined not by comparison of the limited partners' contributions to the appraisal value of the MEP properties, or by comparison of the limited partners' contributions to the value of the shares MEP was to receive (the number of shares multiplied by the $10/share artificial value), but should, instead, be based on the post-issuance, market-value of the shares MEP received.

Integrated common stock began trading on the American Stock Exchange on November 12, 1981. The stock opened at a price of $4–7/8 per share.

**Discussion**

 Mayer's claims survive only if she can demonstrate deception with respect to a material fact relevant to an investment decision. A prerequisite to maintaining an action under 15 U.S.C. 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, is the existence of a misrepresentation, deception, or non-disclosure of material fact. A breach of fiduciary duty alone is insufficient.[1] *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977); *Madison Consultants v. Federal Deposit Ins. Corp.*, 710 F.2d 57, 61 (2d Cir.1983).

In its remand, the Circuit Court set forth theories of recovery discernible in the complaint. Each of these, as required by *Sante Fe*, assumed a deception of Mayer. Under the first theory, the Circuit hypothesized that an exchange of shares worth only $50,000 for a limited partnership interest worth $100,000 would constitute a 10b–5 action if the limited partners were deceived about the value of the shares. Similarly, the Circuit held that determining "payout" based on an arbitrary stock value and not on the market value of shares distributed would establish fraud if the limited partner were deceived about the basis for determining payout. Finally, the Circuit held that a limited partner, even though unable to exercise management control, could invoke state court remedies to prevent consummation of a fraudulent transaction. If through deception, however, the limited partner were denied knowledge of the facts necessary to invoke state remedies, then the limited partner could subsequently bring a federal 10b–5 action. 721 F.2d at 66–68.

The undisputed facts establish that by October 12, 1981, three days prior to the consummation of the transaction, Mayer had knowledge of each of the facts which the complaint alleges to have been concealed. The arbitrariness of the $10.00 valuation for the stock shares was stated plainly in the Prospectus and the Prospectus Supplement, and the fact that the shares might open at a significantly lower market value was revealed and known by Mayer. Moreover, the Prospectus and Prospectus Supplement explained that the $10 figure was an arbitrary divisor whose impact was primarily to determine the number of shares distributed, not the exchange value of the properties involved. The prospectus and supplement disclose that the arbitrary choice of $10/share affected only the number of shares distributed received by the limited partners.

The nature of the relationship among the appraised value of the MEP properties exchanged, the value and number of shares

---

1. There is no allegation in this case of a "manip-

ulation," as that term is defined in *Sante Fe.*

distributed to MEP limited partners, and the determination that "payout" had been reached was also revealed and understood by Mayer. Mayer believed that the determination that payout had been reached was improperly based on the appraisal value of MEP properties—or the necessarily equivalent number of shares distributed multiplied by the arbitrary value of $10 per share—and that a finding of payout should have been based only on the post-issuance market value of the shares distributed. Her self-confessed knowledge of the disparity in these methods of calculation *before* the deal was closed, knowledge based on OFS's disclosures, bars an action under rule 10b–5.

Similarly, although an OFS letter of May 7 did improperly characterize Bache's role as that of an underwriter, the Prospectus, the Prospectus Supplement, and all other written materials, properly characterized Bache's role as that of a dealer-manager. Mayer acknowledges reading the Prospectus, Prospectus Supplement and understanding the difference between an underwriter and a dealer-manager. Because the Prospectus and the subsequent Prospectus Supplement, both admittedly read and understood by Mayer, correct the error, no foundation for a 10b–5 action exists. *See Morgan v. Prudential Group Inc.*, 81 F.R.D. 418, 427–28 (S.D.N.Y.1978).

■ Mayer also asserts deception based upon the statement in the May 7 letter that stocks equivalent to those being issued by Integrated initially drop in price but then "zestily rebound." In order for a prediction to be the basis of a 10b–5 action, the prediction must have been made with an intent to defraud. *Jones Memorial Trust v. TSAI Investment*, 367 F.Supp. 491 (S.D. N.Y.1973). Although the prediction might be found misleading, there is no credible evidence of an intent to defraud with respect to the future performance of the stock price. Specifically, the Prospectus, the Prospectus Supplement, and subsequent correspondence from OFS to Mayer, all admittedly read by Mayer, stressed that the $10 price was arbitrary and there might

be no relationship between the $10 figure and the ultimate market value of the shares. In the absence of any credible evidence showing an effort to distort Mayer's knowledge of the likely ultimate value of the shares, a 10b–5 action cannot rest on the letter alone.

■ In the absence of deception, Mayer's 10b–5 claims must fall. *Sante Fe, supra.* Finally, because Mayer was not deceived and because Mayer had actual knowledge of each of the facts alleged to have been withheld, no cause of action can be maintained under 15 U.S.C. §§ 77k and *l.*

*United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) counsels that in the absence of a federal cause of action, accompanying state claims must be dismissed. The holding that there is an absence of federal jurisdiction clearly does not affect the plaintiff's likelihood of success in another forum on claims alleging the violation of the partnership contract and the general partners' fiduciary duty. Without deciding the issue, I do observe that determining payout by use of the appraisal value of MEP properties, and not by use of the market value of Integrated stock obtained by the limited partners in the exchange, appears to violate the partnership contract and the fiduciary duty owed by the general partners to the limited partners.

## Conclusion

In the absence of a deception with respect to the transactions involved in this action, Mayer's claims must be dismissed. Undisputed facts show that Mayer had knowledge, as a result of OFS's and Integrated's disclosures, of the facts allegedly withheld. The clerk is directed to enter judgment dismissing the case.

IT IS SO ORDERED.