**Stanley B. BLOCK, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**FIRST BLOOD ASSOCIATES; A. Frederick Greenberg; Richard M. Greenberg; Anabasis Investments, N.V.; Mario P. Kassar; Andrew G. Vajna, and Carolco Pictures, Inc., Defendants.**

**CAROLCO PICTURES, INC., Plaintiff,**

v.

**Howard B. SIROTA, an individual, Howard B. Sirota, P.C., a professional corporation, Stanley Block, an individual, and Does 1 through 100, Defendants.**

Nos. 86 Civ. 8811 (RWS), 87 Civ. 4128 (RWS).

United States District Court, S.D. New York.

July 6, 1988.

Rabin & Sirota, New York City, for plaintiff Stanley Block; I. Stephen Rabin, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for First Blood defendants; Jay G. Strum, John D. Chapman, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff Carolco Pictures, Inc.

Oberstein, Doniger & Fetter, Los Angeles, Cal., for plaintiff Carolco Pictures, Inc.

D'Amato & Lynch, New York City, for defendant Howard B. Sirota; Thomas F. Breen, of counsel.

Mark Brenner, New York City, for defendant Stanley Block.

## OPINION

SWEET, District Judge.

Defendants Andrew G. Vajna ("Vajna") and Mario P. Kassar ("Kassar") in *Block, et al. v. First Blood Assocs., et al.*, No. 86 Civ. 8811 ("*Block*"), have renewed their motion to dismiss the complaint of plaintiff Stanley B. Block ("Block") for lack of jurisdiction, and all of the *Block* defendants have moved pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the complaint. Block has moved for class certification under Fed.R.Civ.P. 23 and Local Rule 4(c) of the Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York. In a related case, *Carolco Pictures, Inc. v. Sirota, et al.*, No. 87 Civ. 4128 ("*Carolco*"), defendants Block and Howard B. Sirota ("Sirota") have moved for summary judgment under Rule 56 for an order dismissing the complaint. Plaintiff Carolco Pictures, Inc. ("Carolco") has moved to retransfer *Carol-*

*co* to the United States District Court for the Central District of California for remand to the state court.

These motions were argued and submitted together and because the disputes between the parties arise out of related facts and issues, the motions will be disposed of together. Upon the following facts and conclusions, the motion of Vajna and Kassar is granted and the complaint in *Block* will be dismissed with costs as to them. The motion for class certification in *Block* will be denied with leave granted to renew upon the conditions set forth below. The motions to retransfer *Carolco* and for summary judgment in *Block* and *Carolco* will be denied.

*Prior Proceedings*

On November 14, 1986 Block filed a three-count complaint against the First Blood Associates ("First Blood"), A. Frederick Greenberg ("F. Greenberg"), Richard M. Greenberg ("R. Greenberg") (collectively the "First Blood defendants"), Anabasis Investments, N.V. ("Anabasis"), Kassar, Vajna and Carolco. The first claim is asserted under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder (collectively, "10b–5") against all of the defendants and relates to a private placement memorandum issued by First Blood. The second claim alleges common law fraud and deceit, and the final claim alleges a breach of contract against the First Blood defendants.

Block's complaint alleges that First Blood is a limited partnership which falsely represented in its private placement memorandum (the "Memorandum") that it owned a film "First Blood" and that it would pay the limited partners ninety-eight percent of the net profits of the partnership. The complaint sets forth eight allegedly false representations in the Memorandum; in general, the complaint charges that the Memorandum was "false and misleading in that First Blood was not to and did not acquire genuine ownership of the film since actual ownership was retained by Anabasis." (Complt. ¶ 32(a)). Block contends that in purchasing his interest in First

Blood he relied on these allegedly false representations and was damaged. The complaint further alleges that First Blood owes the limited partners cash distributions pursuant to the terms of the Memorandum.

On February 19, 1987, Block moved for class certification. Pursuant to agreement of counsel, Block's Rule 23 motion was adjourned and considered in connection with the First Blood defendants' present motion for summary judgment.

On March 10, 1987, Vajna and Kassar moved to dismiss Block's complaint against them under Rule 12(b)(2) for lack of *in personam* jurisdiction. Anabasis, Carolco, Vajna and Kassar also moved to dismiss the complaint for failure to plead fraud with particularity as required by Fed.R. Civ.P. 9(b). By opinion dated June 9, 1987, both motions were denied with leave granted to Vajna and Kassar to renew after sixty days in order to afford Block an opportunity to take discovery directed at the jurisdictional issue. *See Block v. First Blood Assocs., et al.,* 663 F.Supp. 50 (S.D. N.Y.1987). Thereafter, Block took the depositions of Vajna and Kassar on July 21 and July 22, 1987, respectively. Vajna and Kassar renewed their motion to dismiss on November 16, 1987.

On February 10, 1987, Carolco commenced its action by filing a complaint for defamation and interference with economic advantage, against defendants Sirota, Howard B. Sirota, P.C. (the "Sirota defendants"), Block and *"Does 1 through 100"*, in the Superior Court of the State of California for the County of Los Angeles on or about February 10, 1987. The *Carolco* complaint alleges that Sirota and Block defamed Carolco by disseminating false information concerning Carolco and its proposed public offering, by preparing and distributing a draft of the *Block* complaint to Carolco's underwriters, by making false charges to the press, and by threatening litigation unless settlement payments were made. Carolco alleges damages resulting from a reduction in the amount sought in its public offering.

On March 18, 1987 the Sirota defendants filed and served their petition for removal

of *Carolco* to the United States District Court for the Central District of California by reason of diversity of citizenship. Block joined in that removal petition on March 24, 1984. Thereafter, the Sirota defendants moved, pursuant to 28 U.S.C. § 1404, to transfer *Carolco* to the United States District Court for the Southern District of New York. By order dated April 28, 1987, the action was transferred to New York and, on June 25, 1987, assigned to this court.

On November 6, 1987, the United States Court of Appeals for the Ninth Circuit filed its opinion in *Bryant v. Ford Motor Co.*, 844 F.2d 602 (9th Cir.1987), holding that "the presence of Doe defendants under California Doe defendant law destroys diversity and, thus, precludes removal" in all such cases. *Bryant*, 844 F.2d at 605. In a footnote, the Court declared that "this new rule will apply retroactively [and that] [f]ederal courts should remand pending cases containing allegations against unnamed Doe defendants to state court...." *Id.* at 606 n. 7. Based on the holding in *Bryant*, Carolco moved to retransfer *Carolco* on November 25, 1987. In response, Block and the Sirota defendants moved on November 30, 1987 for summary judgment dismissing the complaint.

By agreement of the parties all these motions were argued and submitted on March 11, 1988.

*The Facts*

First Blood was formed as a New York limited partnership on July 28, 1981 for the purpose of acquiring the rights to the film "First Blood" from Anabasis which is a privately-owned company organized under the laws of the Netherlands Antilles. The Greenbergs are the sole general partners of First Blood.

On September 1, 1982, under the form of a sale coupled with a service contract (the "Purchase Agreement"), First Blood purchased the film from Anabasis for $200,000 in cash and a recourse note totaling $18,-942,000. The partnership also deposited $3,070,000 into a joint bank account for the payment of certain advertising expenses. At the closing, First Blood entered into a distribution agreement with Anabasis (the "Distribution Agreement"), under which First Blood granted "Anabasis the exclusive right to exploit the film on a worldwide basis in all media for a period commencing on the date of the Distribution Agreement and ending December 31, 1990" and "the exclusive right to exploit the film to the full extent such rights are possessed by the Partnership."

Anabasis agreed to pay the partnership certain "contingent license fees" and certain "additional license fees" if the film generated certain levels of "gross receipts." Contingent license fees were projected to be slightly in excess of the amount due on the recourse note until 1989, when they would increase substantially. From 1982 through 1989, contingent license fees were projected to equal approximately $2,000 per full partnership unit per year. "Additional license fees" were defined as various percentages of the film's gross receipts in excess of $45,000,-000. The Distribution Agreement required Anabasis to pay the partnership "additional license fees as earned."

First Blood sought to take advantage of certain tax regulations in force at the time and to generate long term profits. A report prepared by Touche Ross & Co. set forth the partnership projected substantial tax benefits through 1987 and substantial profits beginning in 1989. A private placement memorandum (the "Memorandum") was issued by First Blood under which limited partnership units were offered to " 'accredited' investors or who either alone or with their purchaser representative(s) have such knowledge and experience in financial and business [sic] that they are capable of evaluating the merits and risks of their prospective investments." The partnership offered twenty-eight limited partnership units for $200,000 each and accepted subscriptions for fractional units. Fifty-seven investors purchased full or fractional interests in First Blood. None invested less than $50,000, and none more than $400,000.

The Memorandum limited the offering to sophisticated and affluent investors. Each

prospective limited partner completed a "purchaser questionnaire" in which he was required to set forth his income tax rate, net worth, education, frequency of investment in marketable securities, and previous investments purchased under the non-public offering exemption from registration under the Securities Act of 1933 (the "1933 Act").

In addition, the partnership required each limited partner who purchased a full partnership unit to assume $662,970 of the recourse note executed in favor of Anabasis (the "Assumption Agreement") or his pro rata share of the recourse note in proportion to his fractional partnership unit. Under the Assumption Agreement, each limited partner was required to bear his proportionate share of the principal amount of the unpaid indebtedness to the extent the contingent licensee fees payable by Anabasis to the partnership were insufficient to pay the principal due on the recourse film purchase note.

The partnership, in return, promised that "the Limited Partners will share in ninety-eight (98%) percent of the net profits, losses and cash flow of the partnership, and the General Partners will receive two (2%) percent of the net profits, losses and cash flow. Distributions to the Limited Partners will be allocated among them in proportion to their respective capital accounts."

In October 1982, Block purchased one-quarter of a partnership unit for $50,000 through a broker, Haas & Co. Block has practiced law for over 30 years, invests frequently in marketable securities, has previously purchased securities exempt from registration under the 1933 Act, and has been a limited partner in a securities trading arbitrage partnership.

Prior to investing in the partnership, Block received and reviewed the Memorandum and the Touche Ross & Co. projections of the partnership's profitability and tax benefits. Block has received all distributions projected in the Touche Ross projections and all tax savings promised. The partnership has paid out ninety-eight percent of the net profits, losses and cash flow of the partnership to the limited partners. Block has received all necessary information for tax reporting purposes promised in the private placement memorandum including all IRS forms K–1. A preliminary review by the Internal Revenue Service ("IRS") has disallowed the tax deduction claimed by a First Blood limited partner, a disallowance which has been appealed.

The Memorandum stated that the partnership would obtain all of Anabasis' right, title and interest to the film including music rights, sound recording rights and merchandising rights:

> ... the Partnership will acquire [from Anabasis], at the Closing all [of Anabasis'] right, title and interest in the film, subject to the retention by persons other than Anabasis of certain ancillary rights ... the rights acquired [include] ... rights relative to exploitation of the merchandising, soundtrack recording and music publishing rights in the film. In effect, the Partnership is the owner in all respects of the actual film.

The Purchase Agreement, however, provided that the "Seller [Anabasis] hereby reserves the following rights:

(a) All rights to any remake ...

(b) All right to stage productions ...

(c) All right in and to all music ...

(d) The rights to use ... sound recordings ...

(e) The right to merchandise ...

(f) The right to publish ...

(g) The right to perform on television ...

(h) All rights ... in the literary work ...

(i) Any option rights ...

(j) The right to make ... "featurettes" ...

Carolco, a Delaware corporation with offices in California, was a successor to Anabasis. Vajna and Kassar are co-chairmen of the Carolco board of directors. Neither saw the First Blood Memorandum at the time of its circulation, and no evidence has been adduced to establish any communications to or from them relating to preparation of the Memorandum.

At some time during the editing of the film, Ted Kotcheff, its director, told Vajna he was looking for a tax shelter. Vajna told him about the First Blood limited partnership. Thereafter, Kotcheff bought an interest, and on February 25, 1983 First Blood paid Vajna a commission of $10,000 in connection with the sale. Kassar has a recollection of sharing the commission with Vajna and during this period recalls sharing a desk and an office with Vajna, seeking to obtain financing for the film and negotiating a foreign distribution agreement.

In 1984 Sirota was retained by Block in connection with his First Blood investment. During the course of the investigation, Sirota learned in October 1986 that Carolco was in the process of making a public offering of common stock and convertible debentures. Sirota obtained copies of Carolco's Preliminary Prospectus and concluded that Carolco represented that it owned all the rights to the film. On October 16, 1986, Sirota contacted Furman, Selz, Mayer, Dietz and Birney, Inc. ("Furman Selz"), one of the lead underwriters involved with Carolco's proposed public offering, with whom he had been associated in the past, and forwarded a draft of the complaint in *Block* in which he had incorporated certain of the materials he had compiled to date.

Sirota was contacted in the latter part of October 1986 by Norman Oberstein ("Oberstein"), an attorney who represented Carolco. According to Carolco's allegations, Sirota demanded an attorney's fee of $500,-000 and an acceleration of certain payments due First Blood. Oberstein sent Sirota a letter dated October 30, 1986 addressing the allegations of the draft *Block* complaint and demanding that Sirota retract the charges communicated to Furman Selz. Oberstein also indicated Carolco intended to "clarify" that it controls the rights to the film in question. Thereafter, Sirota notified the Securities and Exchange Commission ("SEC") that Carolco intended to proceed with a public offering which might contain material misstatements.

Having received no further communications from Oberstein, on November 14, 1986 Sirota commenced the *Block* action. On or about November 26, 1986 Carolco's Registration Statement with the SEC was declared effective, and a final Prospectus was distributed. Carolco successfully offered 3.6 million common shares at $9 per share and $50 million worth of convertible bonds. According to Carolco, the size of the offering was reduced as a consequence of Sirota's acts.

Sirota also telephoned a financial writer at Barron's. Although the draft complaint's allegation that Carolco had failed to account accurately for revenues was deleted from the *Block* complaint as filed, Sirota told the reporter that the investors in First Blood Associates had been, in effect, cheated out of the proceeds and forwarded a copy of the complaint in *Block* to that correspondent. An article that republished Sirota's charges appeared in Barron's.

After filing the *Block* complaint, Sirota requested that the other limited partners retain him in connection with obtaining an accounting from First Blood. R. Greenberg, by letter of December 18, 1984 to the partners, noted the expense of the proposed retention and advised that the information and the results of an audit would be made available. No partner other than Block has retained Sirota.

### The Motion for Summary Judgment to Dismiss the Complaint in Block

It is recognized that defendants seeking summary judgment bear a heavy burden. The movant must establish that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c). *King v. New York Telephone Co.*, 785 F.2d 31, 35–36 (2d Cir.1986); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir.1985). Insofar as the renewed motion of Vajna and Kassar relies on matters outside the complaint in an effort to establish that Block has failed to state a claim against them under the Securities Exchange Act of 1934, it will be treated as a motion for summary judgment. *See* Fed.R. Civ.P. 12(b)(6).

The Second Circuit recently observed that on a motion for summary judgment, the "court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)).

■ A plaintiff alleging a violation of 10b–5 must show that a seller of securities, acting with scienter, employed a scheme or artifice to defraud, made material misrepresentations or omissions of fact, or engaged in an act, practice or course of business that operated as a fraud in connection with the purchase or sale of securities. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). Similarly, "[a]n action for common law fraud in New York requires proof by clear and convincing evidence of: (1) a misrepresentation or omission of material fact; (2) intent to deceive (scienter); (3) reliance by the plaintiff; and (4) injury to the plaintiff caused by plaintiff's reliance on the misrepresentation or omission." *Butz v. Bliss*, Fed.Sec.L.Rep. (CCH) ¶ 93,385 at 97,001 (S.D.N.Y. July 14, 1987) [available on WESTLAW, 1987, WL 14634].

Key is the requirement of a misrepresentation. Under either the federal securities fraud statute or common law fraud, a successful plaintiff must show a "specific material misrepresentation of fact." *Butz v. Bliss*, at 97,002. And, as this court has made it plain in granting summary judgment dismissing the complaint in a similar case involving the sale of limited partnership units pursuant to a private placement memorandum, plaintiff's federal securities claim will survive a motion for summary judgment only if he "can demonstrate deception with respect to a material fact relevant to an investment decision. A prerequisite to maintaining an action under 15 U.S.C. § 78j(b) and Rule 10b–5 promul-gated thereunder, 17 C.F.R. § 240.10b–5, is the existence of a misrepresentation, deception, or non-disclosure of material fact. A breach of fiduciary duty alone is insufficient." *Mayer v. Oil Field Systems Corp.*, 611 F.Supp. 635, 640 (S.D.N.Y.1985), *aff'd*, 803 F.2d 749 (2d Cir.1986).

In *SEC v. American Bd. of Trade, Inc.*, 751 F.2d 529 (2d Cir.1984), the court held that a representation that a purchaser would obtain ownership in an identifiable treasury bill when in fact he would only obtain an interest in a pool of treasury bills, constituted a violation of law. "There was a substantial likelihood that a reasonable person would have considered this to be important in deciding whether to participate in the [Treasury Bill] program." *SEC v. American Bd. of Trade*, 751 F.2d at 537 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *see also SEC v. Netelkos*, 592 F.Supp. 906, 920 (S.D.N.Y. 1984) (holding failure to disclose that stock sold was unauthorized or counterfeit was a violation of Rule 10(b)(5)).

■ Here, there is no factual dispute with respect to the activities of Vajna and Kassar, and the issue is simple and direct: namely, whether defendants Vajna and Kassar possess the "scienter" required as either principals or aiders and abettors in the acts of securities and common law fraud alleged against them. *See IIT, An Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980) (aiders and abettors); *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980) (common law fraud). An individual who did not see the document containing the alleged misrepresentations at issue prior to issuance or participate in any fashion in its preparation, by definition, does not have the knowledge of such purported false representations required to state a claim against them. Because Block has failed to establish that Vajna and Kassar saw the Memorandum during its preparation and dissemination, he cannot establish a *prima facie* case against them.

Vajna's mention of an investment opportunity to Kotcheff and his receipt of a subsequent commission payment do not,

without more, constitute knowing falsity as to the contents of the Memorandum. Although liability under the Securities and Exchange Act may arise out of a single transaction, that proposition does not resolve the renewed motion in Block's favor, nor do the cases relied upon by Block. In *Rooney Pace, Inc. v. Reid,* 605 F.Supp. 158 (S.D.N.Y.1985), *Foreman v. Ambach,* 525 F.Supp. 722 (S.D.N.Y.1981), and *H.L. Green & Co. v. Childree,* 185 F.Supp. 95 (S.D.N.Y.1960), the defendants were shown to have the requisite scienter to create liability under the securities laws. Factually that showing has not been achieved here. Judgment will be entered on notice dismissing the complaint in *Block* against Vajna and Kassar.

In opposition to the motion for summary judgment dismissing his complaint as against the remaining defendants, Block relies on the authorities already cited and on the misrepresentations and omissions which he has alleged relating to:

(1) The nature of the rights that First Blood was purchasing from Anabasis;

(2) The amounts of compensation that the general partner was receiving, directly or indirectly, as a result of the agreements;

(3) The virtual impossibility for limited partners to make a profit, and

(4) The lack of a proper profit motive which would cause the Internal Revenue Service to disallow tax deductions.

Block also relies on *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449–50, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976) in which the Supreme Court reversed a grant of summary judgment in a proxy rules case, stating:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

(quoting *John Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970)). Block notes that the same standard has been adopted in a 10b–5 context. *See, e.g., SEC v. Research Automation Corp.,* 585 F.2d 31, 35 (2d Cir.1978) (summary judgment only when reasonable minds could not differ).

According to Block, the Purchase Agreement directly contradicts the Memorandum's description of the rights acquired by the partnership by stating that Anabasis is not transferring all of its right, title and interest to the film but is reserving remake rights, stage production rights, music rights, sound recording rights, merchandising rights, publishing rights, television rights, literary rights, option rights and featurette rights. Block contends, in effect, that although First Blood may have title in the film, for all practical purposes the Distribution Agreement with Anabasis stripped away First Blood's ownership rights. Block alleges, of course, that this was a knowing deception by the defendants.

The defendants challenge Block's contention principally by referring to Sirota's pre-

complaint letter of November 5, 1986 to the SEC in which he stated:

> We represent a limited partner in First Blood Associates, a limited partnership which owns the movie *First Blood*....
>
> In 1982 our client and other investors purchased the movie *First Blood* from Anabasis, N.V....
>
> Please note that the [Carolco] registration statement filed with your agency, and the preliminary prospectus being circulated by [Carolco], falsely claim ... that [Carolco] owns the movie *First Blood.*

However, while the inconsistent position may bear, *inter alia,* on credibility, it does not remove the issue raised by Block as to whether the statement in the Memorandum was false, given all the facts and circumstances.

With respect to Block's claim concerning the fees paid to the Greenberg interests, which is not yet explicitly set forth in his complaint, Block argues that an investor might consider it relevant to know that the Greenbergs would receive through Interbank, an entity they controlled, a total of $1,281,000 as fees from Anabasis in order to evaluate the likelihood of their enforcing the rights of First Blood against Anabasis for a ten year period. Relying on language in *TSC Indus. v. Northway,* Block argues that there is "a substantial likelihood that the disclosure of the omitted [fee] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. at 449, 96 S.Ct. at 2132; *see also SEC v. Great American Indus., Inc.,* 407 F.2d 453, 460 (2d Cir.1968) (*en banc*) (stating that the substantial undisclosed fee would "raise legitimate question in the mind of a prospective purchaser of GAI Stock whether GAI had been 'taken' and whether the [property] was worth anything like what GAI was paying for it.").

Block's claim that the Greenbergs failed to disclose Interlink's consulting agreement with Anabasis, however, is not supported by a review of the Memorandum which states:

> The Interlink Transfer Group, Ltd. ("Interlink") a corporation controlled by the General Partners, will enter into an agreement to provide services to Anabasis relative to the marketing of its film library and other properties. It is anticipated that Interlink will earn substantial fees under the terms of such agreement in which the Partnership will not share, although it is unlikely that Anabasis would enter into such an agreement but for the closing of the agreements with the Partnership.

Memorandum, p. 39. This disclosure is adequate.

Block also contends that the Memorandum was deceptive on its face by suggesting that the First Blood investment could be profitable. His assumptions and computations raise an issue for resolution and underlie his final proposition that the claimed tax deduction was illusory for a lack of proper profit motive, the position taken initially by the IRS. While the Memorandum contained a disclaimer as to the acceptability of the claim for deductibility, under the circumstances here (the structure of the transaction, the gross required to trigger payments, and the history in the industry), Block argues that a more conservative statement was required to prevent the representation from being misleading. The failure to disclose accurately the tax consequences of an investment has been held to be a violation of Rule 10b–5. *See Sharp v. Coopers & Lybrand,* 457 F.Supp. 879, 887 (E.D.Pa.1978).

In the section entitled "RISK FACTORS," the Memorandum states:

> *Transactions Entered Into For Profit*
> In order for the Limited Partners to be entitled to all of the anticipated tax losses from the ownership and exploitation of the Film, their investment transaction must be "engaged in for profit' "... [P]rospective investors should be aware that ... deductions attributable to investments producing substantial tax benefits may be disallowed on the ground that there was no expectation of sufficient economic benefits to be derived from the investment, apart from tax con-

sequences.... [T]here can be no assurance that the IRS will not ... challenge the deductibility of losses to be incurred by the Partnership.

Memorandum, p. 17. Block's claim that the IRS has "disallowed" the deductions and thereby has established his allegation exaggerates the present situation. A single IRS agent operating out of a single regional office regarding a single year of a single partner's return has recommended disallowance. The partnership has taken the position that the agent's recommendation is erroneous and is appealing to the IRS Appeals Office. Under all these circumstances, however, a factual issue remains as to whether or not the risk of disallowance was properly stated in view of the overall economics of the transaction.

As to Block's remaining claims of misrepresentation, the defendants correctly point out that the existence of a post-memorandum dispute over fees between First Blood and Carolco, which is acknowledged to exist, does not make the Memorandum false and misleading. There is no evidence submitted that the First Blood defendants knew, when they offered the limited partnership units, that the Anabasis defendants would refuse to make some payments First Blood believes are required under the Distribution Agreement. Here, as in *Mayer v. Oil Field Systems Corp.*, 611 F.Supp. at 641, "there is no credible evidence of an intent to defraud with respect to" representations in the Memorandum concerning the payment of additional license fees. Similarly, Block's claim of securities fraud arising out of the failure to provide documentation and tax information has in effect been withdrawn by the results of the discovery process.

■ Genuine issues of fact exist as to the accuracy of the Memorandum's disclosure concerning the nature of the rights that First Blood was purchasing from Anabasis and the adequacy of the Memorandum's disclosure concerning the tax consequences of the transaction. Therefore, the motion for summary judgment dismissing the *Block* complaint in its entirety will be denied.

### The Motion for Class Certification in Block

The requirements of Rules 23(a) [1] and (b) are mandatory, and a class action should not be certified unless all the requirements of Rule 23(a) and one of the requirements of Rule 23(b) are met. As one court explained:

> The burden is on [plaintiff], the party seeking to utilize the class action device, to establish his right to do so. *See Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974); *Cook County College Teachers, Local 1600, AFT v. Byrd*, 456 F.2d 882, 885 (7th Cir.1972). *See generally* Moore ¶ 23.–02–2 at 23–156. As a preliminary matter, he must satisfy all four of the prerequisites contained in Rule 23(a) and then demonstrate that the class he seeks to represent falls within one of the subcategories of Rule 23(b). *See* Moore ¶ 23.03 at 23–228.

*Senter v. General Motors Corp.*, 532 F.2d 511, 522 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *see also Mechigian v. Art Capital Corp.*, 612 F.Supp. 1421, 1432 (S.D.N.Y.1985) ("it is plaintiff's burden to convince the court that the requirements of Rule 23(a) are met"). Here, the principal attack on Block's motion for class certification arises out of the numerosity requirement and the

---

**1.** Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

For class certification under Rule 23(b)(3), the Court must also find:

> that the questions of law or fact common to the members of the class predominate over any questions affecting any individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

potential for a difference in the interests of Block and the proposed class.

Unlike some securities claims certified as class actions, this is not a securities action involving thousands of class members, many of whom are unsophisticated investors, who typically possess only small claims. *See, e.g., Blumenthal v. Great American Mortgage Investors,* 74 F.R.D. 508, 515 (N.D.Ga.1976). At most, this action involves only fifty-seven easily identifiable limited partners. In addition, no limited partner invested less than $50,000 and some invested as much as $400,000. Each limited partner was required to demonstrate substantial net worth to be eligible for the investment. The solicitation to join Block as plaintiff demonstrates that the names and addresses of each of the limited partners were known prior to the commencement of this action and that it was practicable to communicate personally with each limited partner and to arrange for his or her joinder.

The issue of numerosity must be determined in the light of all the surrounding facts and circumstances. In an analogous situation, class certification was denied and joinder of ninety-two limited partners was deemed practicable. *See Spectrum Financial Cos. v. Marconsult, Inc.,* 608 F.2d 377 (9th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). The *Spectrum* Court noted that:

> Following denial of class status ... Spectrum was able to reach all 92 limited partners, 56 of whom joined in the second lawsuit ... This indicates that joinder was not impracticable. Moreover, it may indicate that several potential members of the class did not wish to pursue their claims, despite the fact that it would cost them nothing.

*Spectrum Financial Cos. v. Marconsult, Inc.,* 608 F.2d at 382.

*Spectrum* illustrates that joinder may be practicable if it is possible to reach and communicate with each putative class member. *Accord, e.g., Sharp v. Hilleary Franchise Systems, Inc.,* 56 F.R.D. 34, 37 (E.D. Mo.1972) (joinder not impracticable where all of the limited partners were known).

Further, the potential claims of the purported class members range from $50,000 to $400,000, representing substantial investments. One court has held that claims of as little as $37,000 are sufficient to warrant continuance of actions by the individual class members. *See Reilly v. Frederick,* 21 Fed.R.Serv.2d 163 (N.D.Ala.1976) [available on WESTLAW, 1976 WL 754].

Block has cited *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986), where the Court held that the twenty-nine persons purchasing limited partnerships in a private placement membership satisfied the numerosity requirement of Rule 23(a)(1). There, the court considered, in particular, the "geographical dispersion" of the class members in determining whether joinder was impracticable. In addition, Block has noted that in this Circuit the extent of class member "enthusiasm" or intervention has been deemed irrelevant and meaningless in deciding a Rule 23 motion. *See Korn v. Franchard Corp.,* 456 F.2d 1206, 1209–10 (2d Cir.1972). In particular, Block notes the Circuit's observation that the "notice provisions of subdivision (c)(2) supply the objective mechanism for an apathetic or uninterested member to opt out ...." *Korn v. Franchard Corp.,* 456 F.2d at 1209.

However, potential conflicts concerning Block's position with respect to the tax consequences of the First Blood investment bear on both the numerosity issue and the adequacy of Block's representation. It is entirely possible that given an interest in preserving the tax deduction, a position apparently at odds with Block's litigation posture, none of the putative class members shares Block's position. Indeed, the unsuccessful informal effort seeking joinder seems to indicate such a conflict, which has been recognized as a reason to deny class certification. *Mechigian v. Art Capital Corp.,* 612 F.Supp. at 1433. To place upon the other limited partners the duty to opt out under Rule 23(c)(2) in this context would appear to shift Block's burden to establish the requirements for class action certification. Therefore, the motion for class action certifica-

tion will be denied at this time with leave to renew within ninety (90) days if Block can establish that a meaningful number of limited partners have expressed an identity of interest in the *Block* action.

### The Motion to Retransfer Carolco

Carolco's motion for retransfer to the Central District of California for remand to state court is based exclusively on the decision of the Ninth Circuit in *Bryant v. Ford Motor Company,* 844 F.2d 602 (9th Cir. 1987), which held that the naming of Doe defendants defeats diversity jurisdiction and that, therefore, a district court should remand to state court cases containing allegations against Doe defendants. This holding is based upon Section 581a of the California Civil Procedure Code which allows a plaintiff three years from the commencement of an action to discover the identity of Doe defendants, to amend the complaint accordingly, and to effect service of the complaint on the Doe defendants. Based on this three year discovery provision regarding Doe defendants, the *Bryant* court extended for three years the thirty-day time limitation for removal of actions to federal court as contained in 28 U.S.C. § 1446(b).

Rule 4(j) of the Federal Rules of Civil Procedure states that a defendant must be served within 120 days of the filing of the complaint. Absent good cause, failure to serve within this time renders the complaint subject to dismissal. Federal Rule 15(c) determines the extent to which the parties added by amendment are subject to the complaint's original filing date. Under Rule 15(c), an amendment to the complaint adding a party relates back to the date of the original complaint only if, *inter alia,* the party to be added "(1) has received ... notice ... of the action ..., and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him." As the Honorable Alex Kozinski pointed out in his dissent in *Bryant,* these federal procedural rules cannot be reconciled with the California Procedural Code allowing a plaintiff three years to amend the complaint adding Doe defend-

ants as a matter of right. *Bryant v. Ford Motor Co.,* 844 F.2d at 610–20 (Kozinski, J., dissenting).

The federal removal statute provides as follows:

> The petition for removal of a civil action or proceeding shall be filed within *thirty days* after the receipt by the defendant ... of a copy of the initial pleading.... If the case started by the initial pleading is not removable, a petition for removal may be filed within thirty days after receipt by the defendant of a copy of the amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable.

28 U.S.C. § 1446(b) (emphasis supplied). The *Bryant* court specifically indicated that "the 30–day time limit for removal contained in 28 U.S.C. § 1446(b) will not commence until all Doe defendants are either named, unequivocally abandoned by the plaintiff, or dismissed by the state court." *Bryant v. Ford Motor Co.,* 844 F.2d at 605–06.

■ Federal removal law should be uniform nationwide in operation and application, unaffected by differences in state and local law. *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 104, 61 S.Ct. 868, 870, 85 L.Ed. 1214 (1941). The ease of defeating federal jurisdiction by the addition of Doe defendants under the *Bryant* decision is all too apparent. Moreover, the utilization of Doe defendants is disfavored by the federal courts, and some courts have held that Doe defendants are not permitted in federal practice. *Applegate v. Top Assocs., Inc.,* 300 F.Supp. 51, 53 (S.D.N.Y. 1969), *aff'd,* 425 F.2d 92 (2d Cir.1970); *Hall v. Pacific Maritime Ass'n,* 281 F.Supp. 54, 61 (N.D.Calif.1968).

■ In my view, under the Supreme Court's decision in *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), the California Civil Code must be preempted by the Federal Rules of Civil Procedure. *See also Burlington Northern R.R. v. Woods,* 480 U.S. 1, 107 S.Ct. 967, 94 L.Ed. 2d 1 (1987). Insofar as a federal district

court in New York is not bound by a Ninth Circuit decision,[2] the suggestion in *Bryant* that federal courts should remand to state court pending cases containing allegations against unnamed Doe defendants will not be followed in this case.

■ Finally, as a practical matter here, all the potential defendants in this defamation action alleging tort causes of action have, in fact, been named. Discovery has been had, and there is no allegation of any category of defendants that is likely to be discovered. If the Doe defendants are indeed nonexistent, they should be considered sham parties incapable of identification against whom no cause of action can be stated as a matter of law. *Cf. Saxe, Bacon & Bolan, P.C. v. Martindale–Hubbell*, 521 F.Supp. 1046, 1047–48 (S.D.N.Y. 1981), *aff'd*, 710 F.2d 87 (2d Cir.1983). A party is nominal if no cause of action or claim is or could be stated based on the substantive law of the state where the federal court sits. *Saxe, Bacon & Bolan, P.C.*, 521 F.Supp. at 1048. Until Carolco has identified the Doe defendants or stated an actionable claim against these fictitious parties, at least as to class or category or participation in acts alleged in the complaint, the Doe defendants must be regarded as nominal and not competent to defeat diversity jurisdiction. Therefore, the Carolco motion for a retransfer to the Central District of California for purpose of remand to state court will be denied with leave granted to amend the complaint within twenty (20) days and upon such amendment, or at some later stage in the proceeding, to renew the motion to retransfer in the event that there is reason to believe an as yet unidentified defendant will destroy diversity.

*The Motion for Summary Judgment Dismissing the Carolco Complaint*

The *Carolco* complaint asserts causes of action sounding in defamation, tortious interference with business relations, abuse of process and *prima facie* tort based upon Sirota's alleged demand for payment of legal fees and of sums owing to investors in First Blood Associates. Sirota contends that even if the allegations of the complaint are taken as true, the conduct alleged therein is absolutely privileged under California law.

Section 47 of the California Civil Code[3] provides a broad absolute privilege to statements that have a logical relation to the litigation, are made to achieve the objectives of the litigation, and involve the litigants or other participants authorized by law. *Fuhrman v. California Satellite Systems*, 179 Cal.App.3d 408, 231 Cal.Rptr. 113 (1986). California courts have extended the absolute privilege afforded by Section 47 beyond defamation claims to include tortious interference with business relations, abuse of process and *prima facie* tort. *See, e.g., Rosenthal v. Irell & Manella*, 135 Cal.App.3d 121, 125, 185 Cal.Rptr. 92 (1982); *see also Ribas v. Clark*, 38 Cal. 3d 355, 212 Cal.Rptr. 143, 696 P.2d 637 (1985); *Asia Investment Co. v. Borowski*, 133 Cal.App.3d 832, 184 Cal.Rptr. 317 (1982) (abuse of process); *Block v. Sacramento Clinical Labs, Inc.*, 131 Cal.App.3d 386, 182 Cal.Rptr. 438 (1982) (negligence); *Umansky v. Urquhart*, 84 Cal.App.3d 368, 148 Cal.Rptr. 547 (1978) (intentional infliction of emotional distress, breach of contract); *Brody v. Montalbano*, 87 Cal.App. 3d 725, 151 Cal.Rptr. 206 (1978) (negligent misrepresentation and invasion of privacy); *Pettitt v. Levy*, 28 Cal.App.3d 484, 104 Cal. Rptr. 650 (1972) (fraud). The privilege has been applied to communications prelimi-

---

**2.** Carolco has cited no authority for the proposition that the transferee court is bound with respect to issues of federal practice by the determinations of the Circuit of the transferor court. Absent such authority, the customary federal rule will be applied.

**3.** Section 47 provides, in pertinent part:
A privileged publication or broadcast is one made ...

**2.** In any ... judicial proceeding, or in any official proceeding authorized by law ...

**3.** In a communication, without malice, to a person interested therein (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent ...

nary to a proposed judicial proceeding, *Hagendorf v. Brown*, 699 F.2d 478, 480 (9th Cir.1983), including demand letters from attorneys, *Fuhrman*, 231 Cal.Rptr. at 118; *Larmour v. Campanale*, 96 Cal.App.3d 566, 568–69, 158 Cal.Rptr. 143 (1979), to communications to third parties, *see, e.g., Williams v. Taylor*, 129 Cal.App.3d 745, 181 Cal.Rptr. 423 (1982) (business associates of plaintiff); *Larmour v. Campanale*, 96 Cal.App.3d 566, 158 Cal.Rptr. 143 (1979), and to communications to an official administrative agency, *see, e.g. Imig v. Ferrar*, 70 Cal.App.3d 48, 138 Cal.Rptr. 540 (1977).

■ Notwithstanding the California authorities cited by Block, a question remains as to the applicability of California law. An affirmative defense, here the assertion of the California statutory privilege, is properly the subject of a choice of law analysis that is distinct and separate from that applied to other issues in an action. An issue-by-issue approach to choice of law questions is a controlling principle of modern choice of law analysis. *See* Restatement (Second) of the Conflict of Laws § 145, comment d; *National Semiconductor v. Allendale Mut. Ins. Co.*, 549 F.Supp. 1195, 1198 (D.Conn.1982). The Restatement specifically authorizes a specialized inquiry to determine which state's law will govern whether a tort defendant is excused from liability by reason of privilege or immunity. Restatement (Second) Conflicts § 163; *see Bio/Basics, Int'l v. Ortho Pharmaceutical Corp.*, 545 F.Supp. 1106, 1114 (S.D.N.Y.1982).

■ Under the Supreme Court's decision in *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), a transferee court must apply the law of the transferor court in cases transferred under the federal transfer statutes. *Van Dusen* has been interpreted to require the transferee court to follow the choice of law rules of the transferor court. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 580 F.Supp. 690 (E.D.N.Y.1984); *In re Air Crash Disaster at Washington, D.C. on January 13, 1982*, 559 F.Supp. 333 (D.D.C. 1983). Therefore, the conflicts issue will be determined by reference to California's "governmental interest" choice of law rule. *See Hurtado v. Superior Court*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974).

■ Under the circumstances here, New York, but not California, has an interest in applying its laws to the privilege issue. The fulcrum of a privilege defense is the scope of protection to be afforded under a state's substantive law to otherwise defamatory publications; the purpose of a common law or statutory privilege is the regulation of defamatory conduct that occurs within a state's borders. In this action, New York has a compelling interest in policing tortious conduct committed in New York, by a New York attorney, with reference to future or pending litigation in New York. Indeed, given the procedural complexities of these actions, it is not surprising that Sirota has, in prior proceedings, at a time when he was seeking transfer of this action to a New York court, argued that "it is apparent that New York law and ethical canons should govern this action" and affirmed the compelling interest that New York has in applying its legal standards to Sirota's conduct. In light of New York's interest in such behavior, this case is analogous to the situation where California simply "has no interest in applying its limitation of damages [where it] ... has no defendant residents to protect and has no interest in denying full recovery to its residents injured by [non-California] defendants." *Hurtado v. Superior Court*, 11 Cal.3d at 581, 114 Cal.Rptr. 106, 522 P.2d 666.

Thus, under California's "governmental interest" analysis, New York has an interest in the application of its law to defendant's privilege defense. For the reasons just stated, a California court would regard any conflict with New York law as "false" and apply New York law as that of the interested state. *See Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 163, 148 Cal.Rptr. 867, 870, 583 P.2d 721, 724 (1978). However, to the extent that California does have an interest in the privilege issue, so that a "true conflict" is thereby presented, a California court would still defer to, and apply, New York law because

the failure to do so would impair New York's interest more than the application of New York law would impair California's interest. *Id.* at 163–65, 148 Cal.Rptr. at 871–72, 583 P.2d at 725–26. California's interest, arising from Carolco's location in California, lies in safeguarding its residents and does not extend to the application of California rules of law that do not protect, but instead may defeat, that interest. Accordingly, application of government interest analysis supports the conclusion that the privilege issues in this case should be decided under New York law.

Two extra-judicial publications provide the gravamen of the complaint. First, prior to the initiation of the *Block* action, Sirota published allegedly false and defamatory charges that Carolco had committed acts of securities fraud and false accounting in connection with the First Blood partnership transaction by sending the draft complaint to underwriters and investment bankers doing business with Carolco. Second, Sirota is alleged to have contacted the news media, sent a copy of the *Block* complaint as filed to at least one reporter, and told the press that Carolco was, in effect, cheating people who had invested in its pictures, thereby causing those charges to be disseminated to the public at large.

Under New York law, neither of these extra-judicial publications is absolutely privileged. New York law simply does not provide an absolute privilege for statements made prior to the institution of a judicial proceeding:

> ... [T]he Appellate Division, Second Judicial Department, has clearly held that defamatory statements made before the commencement of a judicial proceeding are not within the protection of the absolute privilege rule ... Moreover, the Third Department has recently relied upon the [Second Department's] decision in reaching a similar conclusion ... In light of the aforesaid decisions of the Second and Third Departments ... this court must hold that the absolute privilege applies in New York only to communications, pleadings, affidavits, briefs or letters submitted or sent on and after the commencement of judicial or quasi-judicial proceedings.

*Rosen v. Brandes,* 105 Misc.2d 506, 432 N.Y.S.2d 597, 601 (1980) (citations omitted).

Further, under New York law, communications to the press about pending litigation are not privileged. A defendant cannot claim an absolute privilege by "institut[ing] a judicial proceeding ... and ... then circulat[ing] a press release or other communication based thereon ...." *Williams v. Williams,* 23 N.Y.2d 592, 599, 298 N.Y.S.2d 473, 246 N.E.2d 333 (1969). Applying New York law, this court has recently held that "[t]he delivery of a copy or report of a complaint to the press is not a statement made during the course of judicial proceedings and therefore is not protected by the common law privilege afforded such statements." *Bridge C.A.T. Scan Assocs. v. Ohio–Nuclear Inc.,* 608 F.Supp. 1187, 1195 (S.D.N.Y.1985). Liability for disseminating defamatory statements contained in a pleading to the press "[u]nder New York law ... is barred neither by the absolute privilege afforded statements made in pleadings, nor by the statutory privilege afforded fair and true reports of such statements." *Id.* at 1194.

Sirota's pre-litigation communications to the underwriters who were participating in Carolco's pending public offering lie at the heart of Carolco's case, and a question arises as to whether Sirota can establish an affirmative defense of qualified privilege as to these communications. Under New York law, a qualified or conditional privilege may exist where statements are made, without malice, in furtherance of a common interest. *Loughry v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 502 N.Y. S.2d 965, 494 N.E.2d 70 (1986). There is no qualified privilege under New York law when such statements are spoken with malice, knowledge of their falsity, or reckless disregard for their truth. *Loughry,* 67 N.Y.2d at 376, 502 N.Y.S.2d at 968, 494 N.E.2d at 73.

To prevail on a qualified privilege defense Sirota must show that his claim of privilege does not raise triable issues of fact that would defeat it. Here, sufficient

evidence has been adduced to support the inference that Sirota acted with malice, and may not, therefore, claim a qualified privilege under New York law. To create the inference of malice, Carolco contrasts Sirota's position taken in *Block* that First Blood was not the owner of the motion picture with his representation to the SEC that First Blood did own the picture. In addition, the alleged demand for payment of $500,000 by Carolco as attorneys' fees may imply an intent to injure. According to Carolco's attorney, Sirota threatened:

> unless Carolco acceded to these demands, [defendant Sirota] would cause the previously circulated draft complaint to be filed in court and that this filing would engender publicity that would lead the investing public to believe that anyone who invests with Carolco would never receive a return on their investment. Therefore, Mr. Sirota told me, Carolco should give in to his demands if it wanted its pending public offering to succeed. Mr. Sirota also told me that he was someone that Carolco should be frightened of and that his reputation should induce Carolco to pay the sums demanded.

Thus, a genuine issue as to malice and appropriate purpose has properly been raised and is sufficient to preclude summary judgment.

Upon the findings and conclusions set forth above, the motion of Vajna and Kassar to dismiss the *Block* complaint is granted, the motion for class certification in *Block* is denied with leave granted to renew within ninety (90) days in accordance with this opinion, and the respective motions for summary judgment in *Block* and *Carolco* are denied. Carolco's motion to retransfer *Carolco* to the Central District of California is denied on the conditions set forth in this opinion.

IT IS SO ORDERED.